**Millard VAUGHN and Barbara Vaughn, Appellants**

v.

**Paul DRENNON and Mary Drennon, Appellees.**

No. 12–09–00064–CV.

Court of Appeals of Texas, Tyler.

July 11, 2012.

Clayton E. Dark, Jr., Lufkin, Darrin Walker, for Millard Vaughn and Barbara Vaughn.

John H. Seale, Jasper, for Paul Drennon and Mary Drennon.

Panel consisted of WORTHEN, C.J., GRIFFITH, J., and HOYLE, J.

## OPINION ON REMAND

JAMES T. WORTHEN, Chief Justice.

This appeal involves an ongoing dispute between neighboring property owners in Sabine County. In this segment, Millard and Barbara Vaughn sued Paul and Mary Drennon for trespass, violation of the water code, and intentional infliction of emotional distress (IIED). Additionally, the Drennons sued the Vaughns for IIED. The two cases were consolidated and tried before a jury. Only the Vaughns appeal, asserting in eight issues that the Drennons' IIED claim fails as a matter of law, the evidence is legally insufficient to support the jury's findings regarding the Drennons' IIED claim, and the trial court erred in disregarding the jury's findings on their statutory violation claim, in excluding certain evidence, and in rendering judgment against them on their trespass claim. We reverse and render in part and affirm in part.

### BACKGROUND

The Drennons purchased a one-half acre lot in Sabine County in 1972, began building their house in 1975, and made it their permanent residence in 1982. That property shares a boundary with property purchased by the Vaughns in 1995. Beginning in 2004, the Drennons experienced problems with significant amounts of water draining from the Vaughns' property to the Drennons' property. The Drennons filed suit, which resulted in a permanent injunction against the Vaughns and an award of actual and punitive damages, rendered in April 2005. The Vaughns appealed. This court rendered a take nothing judgment in favor of Barbara Vaughn and deleted certain injunctions. We held that the trial court did not err by ordering Millard Vaughn to alter the slope of his property to alleviate the drainage problems, but remanded the cause for clarification of the corrective measures he was required to implement. *Vaughn v. Drennon*, 202 S.W.3d 308 (Tex.App.-Tyler 2006, no pet.). In response to our opinion and judgment, the trial court held a hearing, heard additional evidence, granted a permanent injunction against Vaughn, and ordered him to correct the drainage problem. Vaughn appealed the trial court's judgment. This court deleted one injunction and one descriptive phrase in the court's order to correct the drainage problem, but otherwise affirmed the trial court's judgment. *Vaughn v. Drennon*, No. 12-07-00222-CV, 2008 WL 4757016, 2008 Tex. App. LEXIS 8478 (Tex.App.-Tyler Oct. 31, 2008, pet. denied) (mem. op.).

After the trial court's hearing on remand in February 2007, but before our October 31, 2008 opinion and judgment reviewing that injunction, the current phase of the dispute was tried before a jury, on September 22, 2008. The jury found that the Drennons diverted the natural flow of surface water in a manner that damaged the property of the Vaughns, and $4,000.00 would fairly compensate them for that damage; the Drennons trespassed on the Vaughns' property but found $0.00 damages for trespass; Paul Drennon intentionally inflicted severe emotional distress on Millard Vaughn for which Vaughn should be compensated $25,000.00; Paul Drennon did not inflict severe emotional distress on Barbara Vaughn; Millard Vaughn intentionally inflicted severe emotional distress on Paul Drennon for which he should be compensated $25,000.00; and Millard Vaughn intentionally inflicted severe emotional distress on Mary Drennon for which she should be compensated $25,000.00.

The trial court determined that the evidence was legally and factually insufficient to support the jury's findings that the Drennons diverted the natural flow of surface water in a manner that damaged the Vaughns' property, that the Vaughns were thereby damaged in the amount of $4,000.00, and that the Drennons trespassed on the Vaughns' property. Accordingly, the court disregarded the jury's answers to those questions. The court also ordered that Mary Drennon recover $25,000.00 from Millard Vaughn. The court further found that the damage awards that Paul Drennon and Millard Vaughn were entitled to recover from each other for IIED offset each other and spe-

cifically made no award to either of them for their respective IIED claims. Finally, the court ordered that the Vaughns take nothing from the Drennons and that Paul Drennon take nothing from the Vaughns. The Vaughns appealed the trial court's judgment.[1]

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

In their first, fourth, and fifth issues, the Vaughns contend the evidence is legally insufficient to support the jury's findings that Millard Vaughn intentionally inflicted severe emotional distress on Paul or Mary Drennon. In their second and third issues, the Vaughns assert that the Drennons' IIED claim fails as a matter of law because IIED is a gap-filler tort, created for the limited purpose of allowing recovery when a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress. Thus, they argue, the tort of IIED has no application when the actor intends to invade some other legally protected interest or his conduct poses a risk of some harm other than emotional distress.

### Standard of Review

■ Where the appellant is attacking the legal sufficiency of the evidence supporting an adverse finding on an issue for which he did not have the burden of proof, he must show that no evidence supports the jury's adverse finding. *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex.2011). Evidence is legally sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*,

---

1. On appeal, after determining that the trial court's judgment was not a final, appealable judgment, this court dismissed the appeal for want of jurisdiction. *Vaughn v. Drennon*, 324 S.W.3d 617 (Tex.App.-Tyler 2009), *rev'd*, 324 S.W.3d 560 (Tex.2010). The supreme court disagreed, reversed our judgment, and remanded the case to this court to determine the merits of the Vaughns' appeal. *Vaughn v. Drennon*, 324 S.W.3d 560 (Tex.2010).

168 S.W.3d 802, 827 (Tex.2005). We "credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.*

### Applicable Law

To recover for intentional infliction of emotional distress, a plaintiff must show that (1) the defendant acted intentionally or recklessly, (2) the defendant's conduct was extreme and outrageous, (3) the defendant's actions caused the plaintiff emotional distress, and (4) the resulting emotional distress was severe. *Hoffmann–LaRoche, Inc. v. Zeltwanger,* 144 S.W.3d 438, 445 (Tex.2004). Liability for this cause of action shall arise only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. *Twyman v. Twyman,* 855 S.W.2d 619, 621 (Tex.1993). Additionally, the plaintiff must prove by direct evidence the nature, duration, and severity of his anguish with evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. *Parkway Co. v. Woodruff,* 901 S.W.2d 434, 444 (Tex.1995). Generally, the plaintiff must establish a substantial disruption in his daily routine. *Id.*

Furthermore, intentional infliction of emotional distress is a "gap-filler" tort, judicially created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress. *Zeltwanger,* 144 S.W.3d at 447. Where the gravamen of a plaintiff's complaint is really another tort, intentional infliction of emotional distress should not be available. *Id.*

The tort of intentional infliction of emotional distress is available only in those situations in which severe emotional distress is the intended consequence or primary risk of the actor's conduct. *Standard Fruit & Vegetable Co. v. Johnson,* 985 S.W.2d 62, 67 (Tex.1998). Where emotional distress is solely derivative of or incidental to the intended or most likely consequence of the actor's conduct, recovery for such distress must be had, if at all, under some other tort doctrine. *Id.*

### Discussion

A neighboring landowner, James Crocker, explained how the feud between the Drennons and Vaughns began. Millard Vaughn asked the Drennons to remove two shade trees that are in front of their house and to put a ditch in front of their house. They refused so Vaughn filled a ditch in the back of their property and "turned the water loose on them." The record shows that Vaughn engaged in various activities, including making changes on his property to force the flow of water off his property and onto the Drennons' property, contributing to the death of the Drennons' grapevine, soiling their laundry as it hung out to dry, polluting the air with vehicle fumes near where Mary worked in her yard, installing lights to illuminate the Drennons' backyard and shine inside their home, carrying a handgun, and constantly videotaping them. Four witnesses, including the Drennons, testified that they heard Millard Vaughn threaten to shoot them as they stood on the Drennons' property and saw him get a gun out of his truck and point it at them.

These activities constitute a nuisance, a condition that substantially interferes with the use and enjoyment of land causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy it. *Schneider*

*Nat'l Carriers, Inc. v. Bates,* 147 S.W.3d 264, 269 (Tex.2004). Further, Vaughn's act of threatening the Drennons with the gun is an assault. *See Forbes v. Lanzl,* 9 S.W.3d 895, 900 (Tex.App.-Austin 2000, pet. denied). Any intentional interference with property, property rights, personal rights, or personal liberties causing injury without just cause or excuse is an actionable tort. *King v. Acker,* 725 S.W.2d 750, 754 (Tex.App.-Houston [1st Dist.] 1987, no writ). A plaintiff may be entitled to damages for mental anguish if he proves a willful tort. *State Farm Life Ins., Co. v. Beaston,* 907 S.W.2d 430, 435 (Tex.1995). Thus, the gravamen of the Drennons' complaint against Vaughn's actions is really a tort other than IIED. *See Zeltwanger,* 144 S.W.3d at 447.

Additionally, there is some testimony regarding Millard Vaughn's motives. Vaughn's brother explained that Vaughn made the videotapes and put up the lights to defend himself. Barbara Vaughn explained that Vaughn got the video camera to prove the Drennons tried to entrap him. Vaughn explained that he carries a gun to kill varmints. Mary Drennon testified that Vaughn wants their property. Neighbor William Tatum testified that Vaughn told him he would take all of the Drennons' money, leaving them just enough money to live on, and when they died, he would take their place. Finally, James Crocker testified that Vaughn told him he would keep the appeals going for at least fifteen years and by that time the Drennons would be so old they would either be dead or broke; and if they are broke, he planned to take their house. There is no evidence that Vaughn's intended consequence was severe emotional distress. The evidence showed that he wanted to slowly ruin the Drennons financially and eventually take their property. His denial of this motive is not surprising and led him to raise an additional motive, that he was defending himself. Accordingly, because the gravamen of the Drennons' complaint is really a tort other than IIED and because severe emotional distress was not the intended consequence of Vaughn's actions, the tort of IIED is not available as a remedy for the Drennons in this instance. *See Johnson,* 985 S.W.2d at 67. We sustain the Vaughns' second and third issues.

■ Moreover, the record does not show that the resulting emotional distress experienced by the Drennons met the severity requirement. That is, their emotional distress did not rise to a level that no reasonable person could be expected to endure it without undergoing unreasonable suffering. *GTE Sw., Inc. v. Bruce,* 998 S.W.2d 605, 618 (Tex.1999). Mary testified that she no longer goes out when Vaughn is around and does not go out in her yard by herself anymore. She said the gun threat scared her to death, the lights Vaughn put up keep her awake, the stress affects her sleep, her "well being" has decreased greatly, and she is not able "to be around people" the way she used to. She is worried about their finances because they live on a fixed income and they have been out a considerable amount of money because of this situation. She also testified that she worries about Paul's stress because he has a heart condition and she fears for Paul's personal safety. Paul testified that the cameras aimed at their property have affected him and Mary. He explained that the effect on Mary bothers him more. He said that Mary's ability to get outside and enjoy her yard and garden has been affected drastically by Vaughn's actions. Paul also testified that the gun episode frightened him and made him nervous.

William Tatum testified that the Drennons used to be "real pleasant to be around" but they have changed completely.

He said they are under stress "24–7." James Crocker testified that, since the problems with Vaughn started, he noticed a change in the Drennons. He said their nerves are shot. He explained that Paul cannot concentrate; it is as if he "has shorted out." Neighbor Joan McGee testified that Mary's health "has continued to go down" and both Mary and Paul are stressed.

The evidence shows that the Drennons have been affected by Vaughn's bullying. However, the Drennons did not present evidence showing a high degree of mental pain that is more than mere worry, vexation, embarrassment, or anger. *See Parkway Co.*, 901 S.W.2d at 444. Moreover, the disruption in Mary's routine is attributable to a desire to escape from Millard Vaughn's harassing behavior and is not in itself evidence of mental pain and distress. We conclude there is no evidence that either Paul or Mary suffered severe emotional distress as a result of Vaughn's conduct. *See Tidelands Auto. Club v. Walters*, 699 S.W.2d 939, 945 (Tex.App.-Beaumont 1985, writ ref'd n.r.e.) (evidence showing that plaintiff was ill, disoriented, bedridden, angry, in shock, upset, very nervous, threatened to kill people, and could not concentrate or comprehend what was going on was sufficient to show severe emotional distress). Therefore, we sustain Vaughn's first and fourth issues. We need not reach Vaughn's fifth issue. *See* Tex.R.App. P. 47.1.

### DIVERSION OF WATER

 In their sixth issue, the Vaughns contend that the trial court erred in disregarding the jury's answers on their claim that the Drennons violated the water code. The jury answered affirmatively when asked in question one if the Drennons diverted the natural flow of surface water in a manner that damaged the property of the Vaughns. In response to question two, the jury found that $4,000.00 would fairly compensate the Vaughns for those damages. The Vaughns argue that the evidence shows they restored the natural flow of surface water on their property, the Drennons erected a solid metal barrier along their fence line that diverted the flow of water, and that diversion resulted in erosion on the Vaughns' property. They further assert that they presented evidence that it would cost $160,000.00 to repair the erosion on the entire hillside and the jury's $4,000.00 award is within the range of the evidence.

### Applicable Law

 A trial court may disregard a jury's findings and grant a motion for judgment notwithstanding the verdict if there is no evidence upon which the jury could have made its findings. *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex.2003). Thus, a trial court can disregard a jury finding when there is a complete absence of evidence of a vital fact, the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, the evidence offered to prove a vital fact is no more than a mere scintilla, or the evidence establishes conclusively the opposite of a vital fact. *City of Keller*, 168 S.W.3d at 810. We consider whether the evidence would enable reasonable and fair-minded people to reach the verdict under review, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Id.* at 827. The Texas Water Code forbids any person from diverting or impounding the natural flow of surface waters in a manner that damages the property of another by the overflow of the water diverted or impounded. Tex. Water Code Ann. § 11.086 (West 2008).

### Discussion

Lynn Lovett, the surveyor who surveyed the Vaughns' property in October 2006, testified that it did not appear that the "natural ground" had been altered and that the dozer work Vaughn did pretty well brought it back to its natural condition. His testimony and accompanying topographical survey focused on the slope and contour of the hillside to show which way the water flows. John White, who does dirt work, saw the Vaughns' property on July 3, 2008, and testified that the slope looked natural. The Vaughns point to this evidence to argue that they restored the natural flow of the surface water on their property. We disagree.

Tatum testified that, before the Vaughns bought their property, it was "thick with trees" and other vegetation. There was a small drain and no erosion. He testified that the problems started when Vaughn began to work the property. Tatum explained the cause of the erosion was Vaughn's acts of "[r]emoving those trees, tilling, and numerous loads of dirt that [Vaughn] hauled from the back of his place and placed them on his place to get the drainage like he wanted it." It appeared to Tatum that Vaughn was attempting to direct as much water as possible "[r]ight in the back of the Drennons' place." Tatum explained that Vaughn's actions caused the erosion and nothing the Drennons did on their side of the fence had anything to do with any erosion. He testified that the problem with the water running along the fence started when Vaughn dug a ditch beside the Drennons' fence to create a ditch for the water to run in.

James Crocker, who also lives downhill from the Vaughns, explained that Vaughn cut down trees, dug up stumps, filled in the holes, and tilled the land right behind the Drennons' house. He explained that Vaughn created whatever erosion is on the Vaughns' property. He testified that Vaughn put timbers against the Drennons' fence and forced the water into the metal which was against the fence. Crocker testified that, when Temple Lumber Company owned that land, there was a "dry branch" that took care of possible rain runoff.

The record shows that, after April 2005, Vaughn removed the timbers he had placed behind the Drennons' property and filled in the area with dirt. He put up a zig zagging seal fence several times which, according to Mary, caused flooding in her garden. He lined up trees and stumps behind the Drennons' property, causing water to be directed at the Drennons' property.

In arguing that the surface water flows naturally off their property, the Vaughns ignore the additional factors contributing to the flow of water—the removal of natural vegetation, movement of soil, and the deliberate placement of items to direct the flow of water onto the Drennons' property. The hill was there when the Drennons bought their property. Water flowed down the hill and, although there was some drainage on their property prior to 2004, it was easily addressed. In spite of the slope, their property never flooded prior to 2004. Additionally, there is evidence that the Vaughns' property did not suffer from erosion prior to 2004. There is no question that the erosion and drainage issues are due to the flow of surface waters. If the slope remained the same between 1972 and 2008, the erosion on the Vaughns' property and the drainage issues on the Drennons' property must be attributable to something else. Thus, the evidence regarding the slope and contour of the property is no more than a mere scintilla that the surface waters are flowing naturally. *See City of Keller*, 168 S.W.3d at 810.

 Moreover, in our opinion of October 31, 2008, after reviewing evidence recounting events up to February 2007, we determined that the Vaughns' right to have the surface water flow to the Drennons' property was lost when Vaughn altered his property in a manner causing damage to the Drennons. *See Vaughn*, 2008 WL 4757016, at *3, 2008 Tex.App. LEXIS 8478, at *8. The surface water does not flow naturally from the Vaughns' property to the Drennons' property. Therefore, the Drennon property is not bound to accept drainage from the Vaughn property. *Id.* Questions of law decided on appeal will govern the case throughout its subsequent stages. *Trevino v. Turcotte*, 564 S.W.2d 682, 685 (Tex.1978). The issues and facts remain substantially the same, and there is no evidence that the Vaughns' property has been returned to its natural condition, i.e. "thick with trees," between February 2007 and September 2008. While this case went to the jury before our October 31, 2008 opinion issued, the trial court's judgment was signed on December 1, 2008. The trial court was barred by the law of the case from giving any weight to the only evidence offered to prove a violation of Section 11.086. *See City of Keller*, 168 S.W.3d at 810. Accordingly, the trial court did not err in disregarding the jury's answers to questions one and two. *See Tiller*, 121 S.W.3d at 713. We overrule the Vaughns' sixth issue.

### Exclusion of Evidence

In their seventh issue, the Vaughns contend the trial court erred in excluding the audio portion of a video offered as plaintiff's Exhibit 9. They argue that the audio was probative of whether Vaughn intentionally inflicted emotional distress on Paul Drennon and whether Paul Drennon suffered severe emotional distress. The Vaughns assert that the audio is objective evidence that Paul Drennon showed no fear or stress at all with respect to encounters with Vaughn, and in fact sought them out, relished them, and greatly enjoyed the chance to threaten Vaughn with legal action. They assert further that second hand testimony about what was said could not replace this objective evidence. Accordingly, they argue, the jury's finding that Vaughn intentionally inflicted severe emotional distress on Paul Drennon and its award of damages should be reversed.

### Applicable Law

We apply an abuse of discretion standard to the question of whether a trial court erred in excluding evidence. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex.1995). A trial court may be reversed under this standard only when a reviewing court finds that the court acted in an unreasonable or arbitrary manner or without regard for any guiding rules or principles. *Id.; Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex.1991).

Before evidence is admissible, it must be relevant as defined by Texas Rule of Evidence 401. Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Tex.R. Evid. 401. Although relevant, a trial court may nevertheless exclude evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Tex.R. Evid. 403. In order to reverse a judgment based on error in the admission or exclusion of evidence, we must conclude that the error affected a substantial right, thereby probably causing the rendition of an improper judgment. *See* Tex.R. Evid. 103(a); *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex.2004). In order to make this determination, we review the entire

record and require the complaining party to demonstrate that the judgment turns on the particular evidence admitted or excluded. *Id.* The exclusion of evidence is harmless if the evidence is merely cumulative of other evidence in the record. *Pyle v. S. Pac. Transp. Co.*, 774 S.W.2d 693, 696 (Tex.App.-Houston [1st Dist.] 1989, writ denied).

### Discussion

■ The Vaughns offered three separate compilations of the videos taken by Millard Vaughn. They also wanted to play "limited audio" of one of the three, Exhibit 9, because they wanted the jury to hear what Paul was saying to Vaughn. The Drennons objected because the audio presents only Paul's statements, not Vaughn's. The trial court refused to allow the audio, explaining that "there's no testimony that they're not out of context." The court further commented that both parties are in the courtroom and the attorneys can ask them what was said. "That's what sworn testimony is for."

We agree with the trial court. The video showed Paul walking toward the video camera, which was apparently in Vaughn's truck. Vaughn could not be seen. Paul can be heard making agitating, harassing comments on various dates in 2006. From the exhibit, there is no way to know what has been edited out. Accordingly, the trial court could have determined that the audio could mislead the jury. *See* TEX.R. EVID. 403. The trial court did not abuse its discretion by refusing to admit the limited audio portion of Exhibit 9. *See Alvarado*, 897 S.W.2d at 753.

■ Furthermore, any error would have been harmless in light of the fact that Paul's statements on the excluded audio were repeated in testimony. Mary testified that, in that audio, Paul said that the judge is going to like the pictures Paul took of Vaughn and asked Vaughn why he

was out there and why he was taking pictures of Paul. Paul admitted that he said the trial judge would like the pictures he took of Vaughn, although he did not recall saying that the judge favored him or that he had influence over the judge. He admitted that he probably said something to Vaughn when they met in the road, and he once called him a sorry son of a bitch. He testified that he probably asked Vaughn why he was taking Paul's picture, but said he did not recall saying "[s]tick it up your a* *, big boy." Further, Paul explained that he probably spoke to Vaughn in a very vile voice because of the way Vaughn has treated him. Additionally, Vaughn testified as to what Paul said to him when they met on the road. He said Paul would "cuss" him, his mother, and his brothers, and told him that Paul and the judge would "hang" him. He said the judge would enjoy these pictures and Paul and the judge would "take care of Mr. Vaughn." Vaughn testified that Paul called him a son of a bitch. Further, the jury could have observed Paul's demeanor, actions, and body language on the video indicating that he did not appear to be afraid of Vaughn. Because the same evidence was presented to the jury in the form of testimony, any error in excluding the audio portion of Exhibit 9 was harmless. *See Pyle*, 774 S.W.2d at 696. We overrule the Vaughns' seventh issue.

### TRESPASS

In their eighth issue, the Vaughns contend the trial court erred in rendering judgment against the Vaughns on their trespass claim. They argue that there is ample evidence that the Drennons trespassed and that the jury's award of zero damages was contrary to the great weight and preponderance of the evidence. They assert that the Drennons' fence was on the Vaughns' property, thereby appropriating

a portion of the Vaughns' property and preventing the Vaughns from using and enjoying that portion of their property. Further, they argue that the Drennons trespassed by spraying herbicide, gasoline, or diesel fuel on grass on their property, and by causing sewage to flow onto their property. They assert that each trespass contributed to erosion on their property, which constitutes actual damage for which they should be compensated.

### Standard of Review

If a party is challenging the factual sufficiency of a jury finding regarding an issue upon which that party had the burden of proof, he must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex.2001). A reviewing court must consider and weigh all of the evidence and can set aside a verdict only if the evidence is so weak or the finding so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.* The fact finder is the sole judge of the witnesses' credibility and the weight given their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

### Applicable Law

 A claim for trespass to real property requires a showing of an unauthorized physical entry onto the plaintiff's property by some person or thing. *Tex. Woman's Univ. v. Methodist Hosp.*, 221 S.W.3d 267, 286 (Tex.App.-Houston [1st Dist.] 2006, no pet.). The entry need not be in person but may be made by causing or permitting a thing to cross the boundary of a property. *Id.* Where the owner of land establishes that his land has been trespassed upon and appropriated by another to his use, the owner may recover as damages from the trespasser the reasonable value of the use of the portion of the land occupied by him. *Bradley v. McIntyre*, 373 S.W.2d 389, 390 (Tex.Civ.App.-Houston [1st Dist.] 1963, writ ref'd n.r.e.). In the case of temporary injury to real estate, the measure of damages is ordinarily the cost and expense of restoring the land to its former condition, plus the loss or damages occasioned by being deprived of the use of same, with interest. *Id.* at 391. Further, trespass against a possessory interest does not require actual injury to be actionable and may result in an award of nominal damages. *Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1, 12 n. 36 (Tex.2008).

### Discussion

 In their pleading, the Vaughns asserted that the Drennons' "fence and the materials placed by Defendants to obstruct the flow of water were located by Defendants upon Plaintiff's real property which constitutes a trespass by Defendants." In response to Question 3, the jury found that the Drennons trespassed on the Vaughns' property. In response to Question 4, the jury determined that the Vaughns were entitled to $0.00 in damages for trespass. The Drennons did not ask the court to disregard the jury's answer to Question 3, but asked the court to render judgment based on the jury's response to Question 4. In the Vaughns' motion for judgment, they requested the court disregard the jury's answer to Question 4 and requested a new trial on trespass damages. In the judgment, the trial court explained that

> the evidence does not support, legally or factually, the answer of the jury to Question No. 3 of the Court's Charge, but even if it did, the jury's answer of zero to Question No. 4 of the Court's Charge makes the finding in answer to Question No. 3 immaterial. Therefore, the Court disregards the jury's answer to Question No. 3 of the Court's Charge.

For purposes of our discussion, we will assume that the Vaughns were entitled to a fact finding that the Drennons trespassed on the Vaughns' property. We will consider the Vaughns' challenge to the factual sufficiency of the evidence to support the jury's zero damages finding.

The Vaughns argue that they suffered actual damages in the form of the erosion to their property. They claim the damage was caused by the existence of the fence, Paul's spraying herbicide, gasoline, and/or diesel fuel on their property, and the Drennons' act of pumping sewage onto the Vaughn property.[2] Further, they note an owner is entitled to at least nominal damages for trespass as a matter of law. *See Trevino v. Sw. Bell Tel. Co.*, 582 S.W.2d 582, 585 (Tex.App.-Corpus Christi 1979, no writ).

Vaughn testified that he found sewage on his property in February 2006 and sometime in 2007 and showed video of what he claimed was sewage. Assuming it was sewage, there is no evidence that pumping sewage onto the Vaughns' property caused erosion or other damage.

Lovett, the surveyor, testified that, at one corner of the Drennons' property as it meets the west boundary line of the Vaughns' property, the Drennons' fence is a little over a foot over the boundary on the Vaughns' land. The fence gradually comes into line and is not over the boundary line for the entire length of the shared boundary. Vaughn testified that there is erosion on his property next to the Drennons' metal fence, caused by the water hitting the fence. Likewise, Barbara Vaughn denied the allegation that Vaughn dug the ditch along the fence, asserting that the water dug it.

Vaughn admitted that he put timbers behind the Drennons' property, removed those timbers, filled the holes, and tilled the ground where he thought there was sewage. Vaughn testified that he replanted grass "a bunch of times," but he did not specify when, where, or why the grass died. At the time he made this statement, his attorney was questioning him about events that occurred prior to April 2005. Later in his testimony, he explained that he would put up the seal fence, "catch a little dirt, take it down and try to re-spread the dirt, put more grass. But, you know, you can only just—the grass would get killed. It's sandy loam." He testified that Paul would spray weed killer on his grass, by the grapevine which was growing on the Drennons' fence, until Vaughn put up tin to block the spray. He said "[i]t would die about 30 foot up." Therefore, he could not establish a ground cover to prevent erosion. He then explained that he planted grass four times and it is "getting pretty good now since I put the blockage up that they can't spray." He also said Paul poured diesel or gas along the fence line that killed the grass. Vaughn said he could see specific patterns where the grass had been sprayed and he has had no trouble with grass dying in other areas of his property.

The boundary between the two properties is 150 feet long. The evidence shows that Paul poured gas or diesel fuel only on the fence line, ostensibly to kill fire ants. Vaughn does not specify when Paul sprayed the herbicide, how often, how far out from the fence, or how many feet along the fence. The record does not show how large an area near the fence line was affected by herbicides, diesel, or gas.

**2.** We note that, in their pleading, the Vaughns did not assert trespass in any manner other than by the placement of the fence. However, the Drennons did not object to testimony of additional acts of trespass. Therefore, the issue of additional acts of trespass was tried by consent. *See* Tex.R. Civ. P. 67.

There is no evidence of how large an area was ever covered by grass or how much of that grass was killed by herbicides. Additionally, there is no way to know how much of the grass died due to heavy water run-off.

Tatum testified that Vaughn removed trees, tilled the land, hauled in numerous loads of dirt and put it on his place to get the drainage like he wanted it, that is, forcing it into the back of the Drennons' property. Tatum said that Vaughn's actions caused the erosion and nothing the Drennons did on their side of the fence had anything to do with any erosion. He explained that the problem with the erosion along the fence began when Vaughn dug a ditch beside the fence for the water to run in.

When asked if the metal fence diverted the water, Crocker replied that Vaughn put timbers against the fence and forced the water into the metal which was against the fence. Crocker testified that no one did anything to Vaughn's property but Vaughn. He explained that Vaughn cut timber, dug up stumps, filled in holes, and tilled the land behind the Drennons' property.

The record shows that there had been erosion across "the whole hill" and some erosion next to the Drennons' metal fence. However, the vast majority of the erosion was caused by Vaughn's own acts, not by any trespass by the Drennons. There was testimony that vegetation is the greatest erosion preventer and that Vaughn had removed the vegetation. Additionally, Vaughn had, at times, dug ditches, lined up stumps, placed timbers, removed timbers, rearranged the dirt, and installed a seal fence in efforts to direct water at the Drennons' property. Efforts to direct more water at a specified place will result in erosion. Before 2004, when Vaughn began to make these changes to his prop-

erty, drainage off the hill was controlled and did not result in erosion. Thus, the evidence of erosion due to trespass by the placement of the fence, or by herbicide, diesel or gas is so weak and so against the great weight and preponderance of the evidence that such a finding would be clearly wrong and unjust. *See Dow Chem. Co.*, 46 S.W.3d at 242. Additionally, there is no evidence of erosion due to trespass by sewage.

Further, Vaughn told the jury he would leave it up to them to determine a monetary amount of damages for trespass. The Vaughns presented no evidence of the reasonable value of the use of the portion of the land occupied by the Drennons. *See Bradley*, 373 S.W.2d at 390. Additionally, to the extent the Vaughns may have been entitled to nominal damages for trespass, that right was waived when they failed to request nominal damages in the trial court. *See Travelers Ins. Co. v. Employers Cas. Co.*, 380 S.W.2d 610, 615 (Tex.1964). Moreover, where the record shows as a matter of law that the plaintiff is entitled only to nominal damages, the appellate court will not reverse merely to enable him to recover such damages. *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 666 (Tex.2009).

Accordingly, the jury's award of zero damages for trespass by the Drennons' fence, sewage, herbicide, diesel, or gas is not contrary to the great weight and preponderance of the evidence. *See Dow Chem. Co.*, 46 S.W.3d at 242. We overrule the Vaughns' eighth issue.

### DISPOSITION

Because the Drennons cannot recover for IIED, we *reverse* the trial court's judgment to the extent it awards $25,000.00 to Mary Drennon and reform the judgment to delete that award. We *render* judg-

ment that Mary Drennon take nothing on her IIED claim.

Neither Paul Drennon nor Millard Vaughn was ordered to pay the $25,000.00 in IIED damages found by the jury, and neither has complained about that omission on appeal. We **affirm** the trial court's judgment to the extent it orders that Millard and Barbara Vaughn as plaintiffs take nothing from Paul and Mary Drennon and that Paul Drennon take nothing from Millard and Barbara Vaughn.